against the Operating Engineers Health Benefit Fund, Mr. Harvey. Thank you, Your Honor, and may it please the Court. This case arises from the tragic death of Michael Gifford, and I'd like to briefly start by clarifying some of the facts because the District Court's decision and the underlying opinions paint a muddy picture that affects the analysis. So, just briefly, Mr. Gifford showed up in the emergency room on suspicion of a stroke on the 4th of July, 2021. The emergency room doctor, who initially treats him, diagnoses him with a stroke, but the hospital does what we would all hope the hospital would do in this situation. They want to make sure that the initial diagnosis is correct. So they run some additional tests. One of those tests is a CT scan. CT scan confirms he actually did not suffer a stroke. He has an aneurysm. So at that point, the hospital says, okay, we're going to bring in a specialist, a neurosurgeon specialist, Dr. Ahuja, to look at this aneurysm issue. Dr. Ahuja comes in on July 6th, and he runs an angiogram to target what the aneurysm, what's going on with the aneurysm. And the angiogram is important because it's a targeted x-ray where they inject a special dye because you're looking at blood vessels, and those don't typically show up all that well on an x-ray. So Dr. Ahuja on July 6th, and Mr. Gifford, the whole time he's been in the emergency room. On July 6th, the angiogram report is run, and Dr. Ahuja looks at the angiogram report, and he concludes it's clear that the aneurysm is being caused by vasospasm. Now that's important because vasospasm does not typically show up unless the patient has internal bleeding for about five days. So a vasospasm is essentially the artery closing too tightly. It's blocking blood, it's blocking oxygen flow. And so it's tightening too much. And basically what's happening with the body at that point is the patient has been internally bleeding and five days or so long, vasospasm comes up, and the artery tightens because it's trying to block the bleeding. So Dr. Ahuja, from the angiogram reports, concluding there's vasospasm here, so we've had bleeding for days, and then also in his angiogram report from July 6th, so we're still before the July 7th surgery here, Dr. Ahuja says, quote, larger aneurysm found with evidence of prior bleeding, much larger than appears in the diagnostic workup. So what that tells us is by July 6th, the day before the surgery, they've learned that Mr. Gifford has had internal bleeding for about five days, if not more, and they know he's got a much larger aneurysm than they first suspected from the CT scan. And that's what made it an emergency for the first time on July 6th. Again, Mr. Gifford's been in the ER the whole time. But on July 6th, Dr. Ahuja looks at all these factors, and he says, you've been bleeding for days, it's getting bigger, we've got a problem here. So they have a discussion, Mr. Gifford and Dr. Ahuja, and they conclude he needs to have surgery the next day, we've got to stop this bleeding. So the next day, July 7th, they performed, or Dr. Ahuja performed... Counsel, time is short, and you haven't yet gotten the only legal issue in this appeal. I'm just about to get there, Your Honor. The surgery is important because what Dr. Ahuja finds in there confirms the vasospasm problem, because what he found was xanthrocomia, which is a change... Let me put it differently. That physician's view was disagreed with by two other neurosurgeons. And the fund preferred the view of the consultants it engaged to the view of the operating surgeon. Why is that legally actionable? Two reasons. There's the Lane-slash-Garner issue. One of two things happened with Dr. Jasmine's report. If you look at Dr. Jasmine's report, his conclusion is there was no emergency because he found no evidence in the administrative record of prior bleeding. Now, he should have seen the surgical record, set that aside for a moment. Set it aside, yeah. In the administrative record at Fund 172173, that's the July 6th angiogram report from Dr. Ahuja, it specifically says evidence of prior bleeding. So we've got a Garner problem because Dr. Jasmine says, my whole opinion is based on the fact that there's no evidence that the aneurysm had bled, and yet the administrative record specifically says there was prior bleeding. Is your argument that that shows an absence of reasoning? Because we have our case law under ERISA that there's an abuse of discretion if there's an absence of reasoning in the record to support a decision. So is your argument if Jasmine is saying no evidence of prior bleeding, so the fund says we don't need to pay, but there is a record before the surgery that says prior bleeding? Yes. And one of two things happened. Either he received that angiogram report and he ignored it, and in which case you run into the problem, the district we cited cases, the district court also cited cases in both the summary judgment and the reconsideration decision that says, you can't have a reliable opinion if you ignore key evidence. So Dr. Jasmine either got that July 6 report and ignored it because he said no evidence of prior bleeding, or the fund didn't send it to him. And then you run into the Garner problem where you're not providing key material records that your experts need to see. So either road leads to reversal. When you say you're not providing prior records, how did the defendant not provide prior records? The fund must not have sent him the January or the July 6 angiogram. Did anybody ever send that to the fund? It was in the fund's own records. That's why it's Bates labeled fund 172173, I believe is the number. So that was in the administrator. And when? I'm sorry? And when? I thought there was a timing dispute here. There is a timing dispute about the surgical report. I'm saying put the surgical report completely to the side. This is in the fund's own record. The surgical report is Bates labeled Gifford, I think, 5.1 through 5.6. But this is in their own record. You're talking about the angiogram results. Yes, the pre-surgery. Which are the hospital's own records. Yes, and the fund had them. And I see that I'm down to three minutes. If I may, I'd like to reserve the rest of my time. Certainly. Ms. Cefalu. May it please the court and counsel. Amanda Cefalu on behalf of the fund. As you know, the fund is a self-funded multi-employer plan that provides health benefits to the construction. Ms. Cefalu, can you start where we left off? Yes. Because there's an issue of full and fair review. That's one thing. But there's also an issue about whether a decision that the fund has made relies on a reasonable basis. And if there's a record saying prior bleeding. A hospital record. That's in the hospital records. Okay? I've just said the same thing. It's the angiogram results. It's in the hospital records. The hospital has it. The fund has it. And then you have Dr. Jasmine saying there was no evidence of prior bleed. That's a... There's a mismatch there.  The hospital records that were provided to Dr. Jasmine, as he mentioned in his report, was everything up through July 19th at 10 a.m. And then the timing issue relates to a surgical note that was... No, no, no. I'm not talking about the surgical note. Correct. Do you agree that Dr. Jasmine must have had the angiogram results? Yes, because he indicated that he had all of the medical records. And do you agree the angiogram results say there's evidence of prior bleeding? It's a sentinel bleed. It's a vasospasm. It does say that in the medical records. But the reason that the fund relies on a medical expert is because it's his opinion that that was not the relevant inquiry at the time. He made the opinion that based on the entirety of the medical records, which I would submit to you, let's go back a few steps. No, no, no. I get that he has an ultimate opinion. I'm talking about a fact, a major fact in his report that leads to his opinion. He says there was no evidence of prior bleeding. That seems to me in my reading of the record, and that's why I want you to help me. When he says there's no evidence of prior bleeding, that seems to contradict a record from the hospital based on the angiogram that says there's evidence of prior bleeding. I don't believe that he said that there, I mean, he did say there was no evidence of prior bleeding of the, I think, aneurysm. I don't believe, I mean, first of all, this is not the argument that was presented to the lower court. Well, I'm asking about it because the district court does pass over this. Not pass over it. The district court mentions this. And then you also raise it in your appellate brief. So that's why I'm asking about it. Right. The, I believe the issue is with Dr. Jasmine's report, there was also another medical report, but the report from Dr. Jasmine indicated that at the entirety of what was happening, and even though he had an aneurysm, that it could have been treated on an outpatient basis, and that he actually was exposed to more risk because of the treatment that he had where he had been stabilized. So he went into the hospital. Was Dr. Jasmine wrong when he said there's no evidence of prior bleeding? I don't believe so. I mean, based on his review of the medical records, we have to defer to his medical expertise. More importantly, he did not say if there had been evidence of prior bleeding, this would be an emergency. What he's saying is that everything taken together, and the fact that he had received this treatment stabilizing him, and he actually was in the ICU. He was not in the emergency room the entire time. So your position, I have to understand this point. It's critical for me. You don't see a contradiction between his, a fact that he's saying doesn't exist, and yet it does exist in the hospital's records? I mean, if there's a contradiction in that he missed that fact, I think that the ultimate opinion that he made isn't necessarily incorrect based upon his medical expertise. His expertise indicated that he thought that this surgery was dangerous. And if you look at the record, it actually did result in the death of our member. And so my client had received two medical experts' reports, one of them from Dr. Jasmine and another one from Dr. Kalouzian, indicating that both of them taking together thought that this aneurysm was something that should not have been treated right away because he had been stabilized, he had received a plasminogen activator, which potentially exposed him to a higher risk of higher bleeding during the surgery. And so my clients as trustees, they're not medical doctors. They are entitled to rely on what might be reasonable and what is based upon the facts of the case. And here, there might be... And that's where my question comes from, because they have to rely on what's reasonable. And so our case law says, is this a reasonable decision? If it misstates or overlooks a basic fact? I don't think that that fact was overlooked. I think, I mean, I'm not the doctor, and this isn't a case where we engage in discovery because it's entitled to deference. But he did not find that fact to be important. What he found to be important was the fact that he had a higher risk of bleeding because of the prior treatment. And because also, they indicated that this was... Then why didn't he say there was evidence of prior bleeding according to the angiogram result, but that doesn't matter because such and such and such. Instead, he says there's no evidence of prior bleeding, so not an emergency. But what is important from the plan's perspective and whether the plan's decision was reasonable was had he said, because there was no evidence of prior bleeding, if he had said that that was the determinative factor, and then we knew that, and then if we were told during the appeal process that that was incorrect, we would have needed to go back and look at that. But we were told by two different independent medical experts that this procedure itself should not have been done, was not medically necessary for multiple reasons, not only because of the angiogram results. So when you look at from the plan's perspective, whether or not their decision was rational and reasonable, even if there is a small fact that was overlooked or even a large fact that was overlooked, if the entire record is rational and reasonable, the lower court was correct in upholding the plan's decision. And here we have a situation where the surgeon at issue entered some information after records were provided to the plan. And that was really the main argument below is that the plan had an obligation to go out and find... But that's not the one we're discussing right now. Correct. Okay. So if you look at the full and fair review standard, a plan provides a full and fair review provided that the claimant is aware of the reason for the denial of the claim and is provided an opportunity to respond. And if all the information provided to the plan is then considered by the plan prior to making the determination. Here, the plan did provide the Gifford estate with a full and fair review. There's no dispute that they were provided notice of the reasons and the specific reasons. They were also provided... The plan then referred the matter to two independent medical experts. And the plan was not told that an additional review of the surgery was necessary. The plan was not told that the physician had an opinion or was not given any information from Dr. Ahuja justifying the surgery. And so therefore, they relied on what they were provided. And made a rational decision. With respect to count two, there's also a count two where the... Excuse me. The count two was a claim against the plan for breach of ERISA 503A. And they were requesting that the plan be required to have equitable relief. That was dismissed by the lower court because... Sorry. The plan was not... Excuse me for a second. I'm sorry. The lower court was correct in dismissing count two. And was correct in determining that a remand was not appropriate. The record demonstrates that the plan acted reasonably and rationally. And the Garner case is not applicable because the plan had no reason to know that any information was missing. That any information was incorrect in the record. Did the fund refuse to pay for the angiogram too? Not just the surgery, but also the angiogram. No, only the surgery. Only the surgery. So the angiogram's been covered. That is been covered. Any additional questions? Thank you. Thank you, counsel. Anything further, Mr. Harvey? To jump back into the reasonableness, not only did Dr. Jasmine miss the bleeding issue, he also missed another red flag because he said his opinion that there was no emergency was based on the fact that there was no evidence of bleeding. And he also said there was no evidence that the aneurysm was about to rupture. Now, he had to have ignored or not been provided either one. Mrs. Giffords handwritten or not handwritten her appeal letter. It's not long. It's only a page. There's about one paragraph in it that talks about medical issues. She specifically says in there, a ruptured past tense aneurysm is clearly an emergency. He's saying there's no evidence anywhere that it was about to rupture. Her letter says ruptured aneurysm. So the fund either didn't provide him, she didn't provide the surgical report, sure. But that was evidence that there was a rupture that he missed. So the fund either didn't provide that to him, or again, he ignored key evidence. So his opinion was not reliable. Now to the argument, well, we got two reports. The other one should save the first one, even if Jasmine's is unreliable. That's exactly what happened in Garner. And the court in Garner said, no, you don't get to rehabilitate it because your opinions, you specifically said, I'm denying on the basis of both of these two. And one of them is inherently unreliable. So even if they had two reports, that's not sufficient. That's exactly what they dealt with in Garner. On the question of the argument that was just raised, that Mrs. Gifford was given specifics about the basis for the opinion. No, she was not given the specifics. They sent her up, the first letter they said, just acknowledge the appeal and said, we'll get back to you on it. And that's fine. But the second one that they sent, the ultimate denial letter, it didn't lay out exactly what documents that they looked. And a lot of these plan administrators in some of these cases, they'll actually go the step of sending the whole file and saying, this is what we reviewed. Let us know if you think we missed anything. Could have done that. They didn't do that. Or they could have sent, here's a list of all the records that we looked at. That would have been helpful. So she had notice if they were missing something. They didn't do that. All that their letter said was, we're relying on the SPD and we've got the Kalustyan opinion. And we're relying on the what? Dr. Kalustyan opinion. You said some initialism that I didn't get. I'm sorry. I may not have speak to that. It's Dr. Kalustyan's opinion and Dr. Jasmine's opinion. And so that's all they told her that they looked at. And then they eventually sent her copies of both those opinions, but neither of them lay out exactly what they looked at. So she had no notice whatsoever about what records they actually looked at. And in fact, the Dr. Kalustyan opinion in the records reviewed section, it essentially says clinical records received or something. I don't remember the exact phraseology, but it sounds like the whole medical records. So that doesn't tell her anything. There's no red flags. And then you've got Dr. Jasmine's opinion in the records review portion. He says records from July 4th through July 19th. I don't remember if you mentioned freighter, but he said hospital. Well, on the timing issue, Dr. Ahuja's opinion was in the record as of July 19. There was an hour issue, but his doesn't break that out. So there was no reason for Mrs. Gifford to know that they didn't have the surgical report. I see that I'm out of time. So we're asking the court reverse. Thank you. Thank you, counsel. We'll hear argument down.